MUTUAL COTTON MILLS CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 16413.   Promulgated February 7, 1929.

*Jesse I. Miller, Esq.*, for the petitioner.
*P. M. Clark, Esq.*, for the respondent.

OPINION.

LITTLETON: The Commissioner has included the collateral notes of subscribers to class B stock in invested capital at the values of $37,386 for 1920, and $49,044 for 1921. The petitioner contends

that these notes should have been included in the invested capital of both years at their aggregate face value, which it alleges is $80,000.

Sections 326 (a) (2) of the Revenue Acts of 1918 and 1921 require that tangible property paid in for capital stock shall be included in invested capital at its actual cash value as of the date of payment. This is the controlling statutory provision in the decision of the issue presented by this case. The Commissioner's determination appears to ignore this statutory principle, for in place of a constant includable value, which the statute undoubtedly contemplates, he has determined upon progressive values based upon the aggregate sums paid, plus accumulated interest, to the beginning of each year, by the makers of the notes on the purchase price of a part of the collateral security. He treats the payments made by the makers of the notes, in payment of building and loan shares which they have deposited as collateral for the payment of their notes, as though such payments were made to the petitioner in payment for petitioner's class B stock. We entertain no doubt that this is not correct. What the statute contemplates, in the circumstances of this case, is that the notes paid in by subscribers for petitioner's class B stock shall be included in the invested capital of each year at their actual cash value as of the date of payment, until they shall have been converted to some other form of asset, or otherwise disposed of. However, though the underlying theory of the Commissioner's determination appears to be incorrect, we can not say, from the evidence at hand, that petitioner is entitled to include these notes in invested capital at any greater values than those determined upon by the Commissioner.

The notes in question, as previously stated, were given in payment for petitioner's class B stock. Each of the subscribers to that stock entered into the subscription agreement, and gave their notes in payment of their respective subscriptions, with the explicit understanding, which was tantamount to a binding agreement, that such notes were to be paid out of the proceeds of their matured shares of building and loan stock. Indeed, the notes themselves provide for payment thereof " On or before maturity of the 16th Series " of the capital stock of the Home Building and Loan Association. None of these notes bore interest until after maturity. There is no evidence as to when the " 16th Series " of capital stock of the Home Building and Loan Association matured; but it is a matter of common knowledge that shares in building and loan associations. may mature anywhere from 5 to 11 years. We call attention to the finding that payments for shares of capital stock of the Home Building and Loan Association were made by subscribers thereto at the rate of 25 cents a week per share. This fact indicates that the maturity of the series of building and loan shares was several years subsequent to the dates of

the notes in question. It is inconceivable that these noninterest-bearing notes maturing several years later would have an actual cash value, at the date of their making—which presumably was the date when paid in for petitioner's stock, equal to their full face value.

Only one witness was called in petitioner's behalf; and he was not called upon for an expression of opinion as to the value of these notes when paid in to petitioner. He did testify that he and Armstrong agreed between themselves to stand back of these notes; but we believe that could have but little bearing upon the value of the notes when paid in. At best, it could be regarded as a mere assurance of payment of the notes when they matured. He stated. that both he and Armstrong had made bank borrowings on their holdings of petitioner's class B stock, and that any one of the makers of the notes in question could have borrowed from the bank an amount equal to the par value of the shares of class B stock deposited as collateral for their notes. We were not given any of the details of the borrowings of the witness and of Armstrong on the strength of their holdings of class B stock, and we regard the witness's statement as to the ability of any of the several makers of the notes in question to consummate like transactions as merely an expression of opinion. But assuming these facts to be true, they could have only a very remote bearing upon the value of the notes for the payment of which they were deposited as collateral.

Furthermore, there is no evidence as to the total amount, or aggregate face value, of the notes in question. It was alleged in the petition that the total amount was $80,000; but that allegation was included in the general denial of the Commissioner, and the petitioner offered no proof to support it. So, even if petitioner was entitled to include these notes in invested capital at full face value, we would still be at a loss to find just what that value is. Furthermore, without knowing what the face amount of these notes is, and the length of time they were to run from the date paid in, and without any sufficient evidence as to their value at the date paid in, we are wholly without facts upon which to base a conclusion as to what their value may have been at the basic date. It is true that we have found that the subscription agreement before organization contains the signatures of 89 subscribers to 695 shares of class B stock, who apparently subscribed under the conditions outlined in the findings of fact, but there is no evidence that class B stock was actually issued to these subscribers in the amounts subscribed for.

We are unable to determine, from the evidence at hand, the actual cash value of the notes in question when paid in for petitioner's class B capital stock, and, consequently, we may not disturb the Commissioner's determination as to said value.

The Commissioner's reduction of the gross earnings by the amount of a tentative income and profits tax, for the purpose of determining the earnings available for distribution, is contrary to the decision of this Board in *L. S. Ayers & Co.*, 1 B. T. A. 1135, and, accordingly, is disapproved.

In accordance with the admissions of the Commissioner's counsel, made at the hearing, net income for 1920, as determined in the deficiency notice, should be reduced by $1,041.81, on account of the expense incurred for painting, and net income for 1921 should be reduced by $2,011.89, on account of income tax due to North Carolina for that year.

*Judgment will be entered under Rule 50.*